**ATLAS MILLING CO. v. JONES, Collector of Internal Revenue.**

No. 6578.

District Court, W. D. Oklahoma.

Oct. 19, 1939.

Paul E. Bradley and Chas. M. Grayston, both of Joplin, Mo., for plaintiff.

Lester L. Gibson, Sp. Asst. to Atty. Gen. (Chas. E. Dierker, U. S. Dist. Atty., and George H. McElroy, Asst. U. S. Dist. Atty., both of Oklahoma City, Okl., on the brief), for defendant.

VAUGHT, District Judge.

This is an action brought by the plaintiff for the recovery of income and excess profits taxes for the year 1933, paid under protest to the defendant, as collector of internal revenue. A jury was waived by written stipulation properly filed.

There is no controversy over the jurisdiction of the court nor the right of the plaintiff to maintain its action. The sole question involved is the construction of chapter 209 of the Revenue Act of 1932, 47 Stat. 169, with reference to depletion, and the application of said statute to the facts involved in the present case.

The plaintiff alleges that prior to the year 1933, large and extensive underground mining operations had been conducted in and upon certain lands in Ottawa County, Oklahoma, by a former lessee of said lands, said lands consisting of 40 acres and being valuable mineral property.

The plaintiff alleges that the lease held by the former lessee expired prior to the year 1933. That as a result of said mining operations, the said former lessee had deposited upon the surface of said lands a large pile of rock, dirt and other materials commonly called chats or tailings; that said chats or tailings contained small particles of lead and zinc minerals, some of which were contained in the rock in the natural state and condition, deposited therein by natural processes, that is, in the same natural state or condition that obtained before said rock was broken and taken from below the surface of the lands; that said chats or tailings now deposited on said lands became and were a part of the freehold estate.

During the month of July, 1933, the plaintiff entered into a lease contract with the owners of said lands, under the terms of which the plaintiff was granted the exclusive right and privilege for the period

ending January 1, 1936, to go upon said lands, to dig, remove and mill said chats or tailings for the purpose of recovering the lead and zinc minerals therein contained, on condition that the plaintiff pay the royalties specified in said lease contracts and otherwise fully perform the terms and obligations thereof. The plaintiff proceeded to mill said chats or tailings by improved processes and to recover therefrom the zinc and lead content and during such taxable year the plaintiff received the gross sum of $43,579.84; it paid royalties therefrom in the sum of $10,782.18, leaving as the amount received by the plaintiff from said sale of ore, the sum of $32,797.66; the cost of operation in producing said ores was the sum of $22,320.59, leaving a profit from sales of ore in the sum of $10,477.07. Additional income from discounts from bills and notes payable amounted to $191.88. In its return, the plaintiff claimed as deductions allowed by law, items of interest, taxes, salaries, wages, and administrative expense, in the sum of $2,067.76, and a deduction for depreciation on its mill plant and equipment, in the sum of $6,477.08. The total amount of all deductions set forth and claimed by the plaintiff in such return, before any allowance for depreciation, was $8,544.84, which deducted from plaintiff's gross income of $10,668.95 would leave a net income of $2,124.11.

The plaintiff then alleges that under the provisions of Sections 23(l) and 23(m) and of Section 114(b) (4) of the Revenue Act of 1932, 26 U.S.C.A. §§ 23(l, m), 114 note, it was entitled to an allowance for depletion of a sum equal to 15% of the gross income from said property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by plaintiff in respect of the property, such allowance not to exceed 50% of the net income of the plaintiff, computed without allowance for depletion, from the property in question.

The plaintiff, therefore, claimed an allowance for depletion upon the basis of 15% of the sum of $32,797.66, limited however to 50% of the plaintiff's net income of $2,124.11, or a net depletion of $1,062.06. The plaintiff reported and paid as income tax for the year in question the sum of $146.03 and reported further that there was no excess profits tax due or payable by it.

The Commissioner of Internal Revenue refused to accept the report and return so filed by the plaintiff and refused to approve the computation of tax and the assessment made by the plaintiff, and caused the plaintiff to be notified that its income and excess profits tax return had been audited and that the Commissioner had determined upon and would make a deficiency assessment against it based upon his findings. The Commissioner denied the claim for percentage depletion, except in the amount of $421.08, and assessed an income tax against the plaintiff for the year in question in the sum of $490.44 and an excess profits tax of $106.45, making a total deficiency assessment of $596.89, which sum, together with interest and penalties amounting to $69.92, or a total of $666.81, was paid by the plaintiff under protest. The plaintiff alleges that said sum represented an overpayment of $390.83, for which sum this suit is brought.

The sole question involved in this case is whether or not the plaintiff is entitled to what is known as a miner's depletion allowance.

Section 23(m) of the Revenue Act of 1932, 47 Stat. 179, 26 U.S.C.A. § 23(m), provides: *"Depletion.* In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * *"

Section 114(b) (4) of the Act of 1932, 47 Stat. 202, 26 U.S.C.A. § 114 note provides: *"Percentage depletion for coal and metal mines and sulphur.* The allowance for depletion shall be, in the case of coal mines, 5 per centum, in the case of metal mines, 15 per centum, and, in the case of sulphur mines or deposits, 23 per centum, of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance for the taxable year 1932 or 1933 be less than it would be if computed without reference to this paragraph. A taxpayer making return for the taxable year 1933 shall state in such return, as to each property (or, if he first makes

return in respect of a property for any taxable year after the taxable year 1933, then in such first return), whether he elects to have the depletion allowance for such property for succeeding taxable years computed with or without reference to percentage depletion. The depletion allowance in respect of such property for all succeeding taxable years shall be computed according to the election thus made. * * *"

Treasury Regulations 77:

"Article 221. *Depletion of mines, oil and gas wells, other natural deposits, and timber; depreciation of improvements.* Section 23(1) provides that there shall be allowed as a deduction in computing net income in the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements. Section 114 prescribes the bases upon which depreciation and depletion are to be allowed.

* * * * * *

"When used in these articles (221-248) covering depletion and depreciation—

* * * * * *

"(b) A 'mineral property' is the mineral deposit, the development and plant necessary for its extraction, and so much of the surface of the land only as is necessary for purposes of mineral extraction. The value of a mineral property is the combined value of its component parts.

"(c) A 'mineral deposit' refers to minerals only, such as the ores only in the case of a mine, to the oil only in the case of an oil well, and to the gas only in the case of a gas well, and to the oil and gas in the case of a well producing both oil and gas. The cost of a mineral deposit is that proportion of the total cost of the mineral property which the value of the deposit bears to the value of the property at the time of its purchase."

The defendant contends that the tailings piled upon the surface of the ground did not constitute a mine or mineral deposit; that the process of mining was conducted in prior operations which resulted in the tailing piles being dumped on the surface as refuse from milling the ore; that the reclamation process of the taxpayer was a manufacturing process only of material previously mined, which had lost its identity as a natural deposit, and that the same could not be construed to be a mining operation according to the accepted definition.

There is no controversy over the facts in this case. The contract of the plaintiff was to produce lead and zinc from the tailings, chats, earth and rock piled on the surface of the land in question.

The depletion provided for in the section above quoted has particular reference to minerals in place, that is, in the earth before they were mined. There is more or less speculation as to the amount of minerals to be recovered from any mine, and it is necessary for the operator to incur large expenses in building mills, in digging shafts for the production of the ore, and in reducing it to a salable commodity after it has actually been brought to the surface. There may be a large or small quantity of ore, but whatever amount there is under the earth is naturally reduced by the mining operation and, therefore, in determining the operator's investment, a certain amount of depletion has been provided in the Act to cover this reduced deposit by the operation.

It is the government's contention that only the owner of the mine, the one who possesses the ore in place and whose capital asset will be reduced by the mining operation, is entitled to this particular depletion allowance.

In this case, all of the material was above the surface of the earth. It was a pile of chats, rock, dirt and ore. The lease contract gave the plaintiff the right to take this material, which was in existence above the surface, plainly in view, and mill the same so as to secure therefrom the mineral content. Plaintiff knew what it was doing to start with; knew the amount to be milled, and it furthermore knew that after it had completed the milling of the material above the surface that its contract was at an end.

The operator of a mine, of course, never knows when he will be through his operations until the mineral in place has been exhausted, which may be at any time, and it is because of the uncertainty of the results and the speculation upon which he must depend, that this depletion allowance was provided.

The process of mining minerals is not unlike that of producing oil and gas. There are many cases construing this statute in which natural gas was produced from a gas or oil well. The natural gas or wet gas was processed so as to remove therefrom the gasoline content and there would be left as residue certain material

which had a value for some purposes. The authorities have held that where one enters into a contract with a producer of natural gas or wet gas to remove the gasoline therefrom, he is not entitled to the depletion to which the owner of the well would be entitled.

In the case of South Utah Mines & Smelters v. Beaver County, 262 U.S. 325, 332, 43 S.Ct. 577, 579, 67 L.Ed. 1004, which case is cited by both plaintiff and defendant, the court said: "The tailings, severed and removed from the mining claims, changed in character, placed on other and separate lands and having an ascertained and adjudicated value of their own, in our opinion, constituted a unit of property entirely apart from the mine from which they had been taken."

In Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 617, 82 L.Ed. 897, the court said:

"Natural gas, commonly known as 'wet gas' as it flows from the earth, is not a salable commodity. It is only through processing—by separation of the gasoline therefrom—rendering it dry, that it may be sold for commercial uses. Conversely, it is only through the separation of dry gas from wet gas that the gasoline is salable. It is this process that produces casing-head gasoline. The content of gasoline in wet gas varies from one-half gallon to six gallons a thousand cubic feet of gas produced, depending upon its richness. Respondent's contracts provided, generally, that it should install and maintain the necessary pipe lines and connections from casing heads or traps at the mouth of the well to its plant, through which the producer agreed to deliver the natural gas produced at the well and that respondent should extract the gasoline therefrom, respondent to pay the producer 33⅓ per cent. of the total gross proceeds derived from the sale of gasoline extracted from wet gas, or, at producer's option, to deliver to the producer 33⅓ per cent. of the salable gasoline so extracted. * * *

"The government maintains that under the contracts respondent took no part in the production of the wet gas, conducted no drilling operations upon any of the producing premises, did not pump oil or gas from the wells, and had no interest as lessor or lessee, or as sublessor or sublessee, in any of the producing wells. * *

"In order to determine whether respondent is entitled to depletion with respect to the production in question, we must recur to the fundamental purpose of the statutory allowance. The deduction is permitted as an act of grace. It is permitted in recognition of the fact that the mineral deposits are wasting assets and is intended as compensation to the owner for the part used up in production. United States v. Ludey, 274 U.S. 295, 302, 47 S.Ct. 608, 610, 71 L.Ed. 1054. The granting of an arbitrary deduction, in the case of oil and gas wells, of a percentage of gross income, was in the interest of convenience and in no way altered the fundamental theory of the allowance. United States v. Dakota-Montana Oil Co., 288 U.S. 459, 467, 53 S.Ct. 435, 438, 77 L.Ed. 893. The percentage is 'of the gross income from the property,'—a phrase which 'points only to the gross income from oil and gas.' Helvering v. Twin Bell Oil Syndicate, 293 U.S. 312, 321, 55 S.Ct. 174, 178, 79 L.Ed. 383. The allowance is to the recipients of this gross income by reason of their capital investment in the oil or gas in place. Palmer v. Bender, 287 U.S. 551, 557, 53 S.Ct. 225, 226, 227, 77 L.Ed. 489."

It may be true that the crushing of this stone and the removing of the mineral content are in the nature of mining operations, and had the owner of the mine made the claim which the plaintiff makes, a different question would have been presented, but the plaintiff is engaged in purely a manufacturing operation, which may be an element in mining. However, this depletion allowance is for the benefit of the owner of the mine and not for the benefit of one who engages by contract to do some specific thing.

The court, therefore, is of the opinion that the Commissioner was correct in refusing the claim for depletion. Judgment will be for the defendant. Findings of fact and conclusions of law are made and filed. A form of judgment, consistent with this opinion, may be submitted. Exceptions are allowed plaintiff.